## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| KHUSHNOOD ALI BAZ,<br><br>                       Plaintiff,<br><br>           -against-<br><br>DEPARTMENT OF HOMELAND SECURITY;<br>KIRSTJEN M. NIELSEN, in her official capacity<br>as Secretary of the Department of Homeland<br>Security; JEFFERSON B. SESSIONS, III, in his<br>official capacity as Attorney General of the United<br>States; FEDERAL BUREAU OF<br>INVESTIGATION; CHRISTOPHER A. WRAY, in<br>his official capacity as Director of the Federal<br>Bureau of Investigation; TERRORIST<br>SCREENING CENTER; and CHARLES H.<br>KABLE, IV, in his official capacity as Director of<br>the Terrorist Screening Center;<br>TRANSPORTATION SECURITY<br>ADMINISTRATION; and DAVID P. PEKOSKE,<br>in his official capacity as Administrator of the<br>Transportation Security Administration,<br><br>                      Defendants. | Civil Action No.: _____<br><br>**COMPLAINT**<br><br>JURY TRIAL DEMANDED |

## INTRODUCTION

1.     This action is brought under the United States Constitution, 5 U.S.C. § 701, *et seq.*, 49 U.S.C. § 44903, and 49 U.S.C. § 44926 against Defendants, who violated the federal constitutional and statutory rights of Plaintiff Khushnood Ali Baz ("Dr. Baz") by apparently adding him without any justification to the federal government's No-Fly List, failing to confirm or deny his inclusion on the No-Fly List despite twice denying him entry into the United States, denying him due process to challenge his apparent inclusion, and revoking his and his immediate

family members' U.S. visas in retaliation for Dr. Baz's decision to file suit to redress these constitutional and statutory violations.

2.     Dr. Baz is a prominent physician in Pakistan with extensive voluntary ties to the United States.  He owns a house in the United States.  His son is a U.S. citizen.  He has traveled regularly to the United States for the past 39 years.

3.     Since 2016, however, Dr. Baz has twice been prevented from boarding flights with final destinations in the United States.  Although Defendants will neither confirm nor deny that he is on the No-Fly List, upon information and belief, Dr. Baz was placed on the No-Fly List by the Terrorist Screening Center ("TSC"), and such designation was factually baseless, arbitrary, capricious, and gravely mistaken.

4.     Dr. Baz has no connections to terrorism and poses no threat to aviation or U.S. national security.  In fact, Alain Lamballe, a retired brigadier-general in the French Army, South Asia scholar, and counterterrorism expert, acknowledged Dr. Baz's beneficial contributions to the brigadier-general's recently published book on the Pashtun people.

5.     Dr. Baz's apparent inclusion on the No-Fly List is plainly the result of error on the part of the federal government.

6.     Dr. Baz has submitted applications for redress through the only available government mechanism.  He has been issued two separate Redress Control Numbers ("RCN") but received no relief.  No government official or agency has confirmed that he is on the No-Fly List or offered any explanation for the prohibition of Dr. Baz from travel to the United States.  Nor has he been provided a meaningful opportunity to contest his apparent placement on the No-Fly List.

7.     Dr. Baz filed a Petition For Review Under 49 U.S.C. § 46110 (the "Review Petition") with the United States Court of Appeals for the District of Columbia Circuit in

connection with the second of two redress inquiry decision letters he received. A month after he

filed the Review Petition, U.S. consular officials in Pakistan summarily revoked his, his wife's,

and his daughter's multiple-entry U.S. visas. When Dr. Baz's counsel observed that the timing of

the visa revocations was suspect in view of the pending Review Petition, the Assistant U.S.

Attorney representing the government in the Review Petition denied that the revocations were

retaliatory and committed to providing further information proving that the revocations were

unrelated to Dr. Baz's petition. The Assistant U.S. Attorney never provided further information.

8.      Through this action, Dr. Baz is seeking a confirmation that he has indeed been

added to the No-Fly List. Dr. Baz also seeks a fair hearing or other opportunity to confront any

evidence against him, contest any unjustified designation, and effect removal of his name from the

No-Fly List.

## **PARTIES**

9.      Dr. Baz is a prominent physician and a citizen of Pakistan. He resides in Peshawar,

Pakistan, with his wife and two children. Dr. Baz has no criminal record and no links to terrorism.

Although Dr. Baz is not a citizen or lawful permanent resident ("LPR") of the United States, he

has significant voluntary connections with the United States.

10.     Defendant Department of Homeland Security ("DHS") is a department of the U.S.

Government. It develops and coordinates the implementation of a comprehensive national strategy

to secure the United States from terrorist threats or attacks.

11.     Defendant Kirstjen M. Nielsen is the Secretary and head of DHS and is sued in her

official capacity.

12.     Defendant Jefferson B. Sessions, III is the current Attorney General of the United

States and heads the Department of Justice ("DOJ"), a department of the U.S. Government that

3

oversees the Federal Bureau of Investigation ("FBI").  Defendant Sessions is sued in his official capacity.

13.     Defendant FBI administers TSC, which was created to consolidate the government's terrorism-screening efforts.

14.     Defendant Christopher A. Wray is the Director of the FBI and is sued in his official capacity.

15.     Defendant TSC is a department of the U.S. Government.  It maintains a list of "Terrorist Identities Information" for agencies of the U.S. Government, including Defendant Transportation Security Administration ("TSA").  TSC is responsible for maintaining a consolidated screening database (the "Watch List").  The No-Fly List is a subset of the Watch List, against which airlines are required to check passenger names and prohibit individuals on the list from boarding flights whose paths include U.S. airspace.

16.     Defendant Charles H. Kable, IV is the Director of TSC and is sued in his official capacity.

17.     Defendant TSA is a department of the U.S. Government.  It is an agency of DHS and has authority to regulate airport security.

18.     Defendant David P. Pekoske is the Administrator of TSA and is sued in his official capacity.

## JURISDICTION AND VENUE

19.     This Court has federal question jurisdiction under 28 U.S.C. § 1331 because this action arises under the Fifth Amendment of the U.S. Constitution and under federal statues, including the Administrative Procedure Act ("APA"); 5 U.S.C. §§ 553, 706; and 49 U.S.C. §§ 44903, 44926.  The Court also has jurisdiction under 28 U.S.C. § 1346 (providing jurisdiction in

civil actions against the United States) and 28 U.S.C. § 1361 (providing jurisdiction to compel officers and employees of federal agencies to do their duties). This Court has power to award the declaratory and injunctive relief requested herein under the Declaratory Judgment Act (28 U.S.C. §§ 2201–2202), the APA (5 U.S.C. § 706), and 28 U.S.C. § 1361.

20.     Venue is proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to this action occurred in this district. Venue is also proper pursuant to 28 U.S.C. § 1391(e) because Defendants are officers of agencies of the United States sued in their official capacities.

## GENERAL ALLEGATIONS

### A.  The Federal Government's Watch and No-Fly Lists

21.     Since its founding in 2003, TSC has been responsible for developing and maintaining the federal government's Watch List, also referred to as the Terrorist Screening Database. The Watch List is the government's master repository of known or suspected terrorists. TSC uses the Watch List to identify and track known or suspected terrorists when they attempt to obtain visas, enter the country, board an aircraft, or engage in other activities.

22.     Two government entities are primarily responsible for nominating individuals for inclusion in the Watch List: the National Counterterrorism Center and the FBI. TSC makes the final decision on (1) whether a nominated individual meets the minimum requirements for inclusion in the Watch List as a "known or suspected terrorist" and (2) which screening systems will receive the information about that individual.

23.     Upon information and belief, data from the Watch List flows to at least the following federal government lists: (i) the No-Fly List (maintained by TSC), a subset of the Watch List that identifies individuals who are prohibited from flying to, from, or over U.S. territory; (ii)

the Selectee List (also maintained by TSC), another subset of the Watch List that identifies individuals who are subjected to additional questioning, inspection, and screening before being allowed to board flights to, from, or over U.S. territory; (iii) Consular Lookout and Support System, maintained by the Department of State to identify individuals who may be ineligible for a visa or passport; (iv) TECS (formerly the Treasury Enforcement Communications System), maintained by DHS, disseminated to approximately 20 federal agencies and used to determine whether persons seeking to enter the country are admissible; and (v) the Known or Appropriately Suspected Terrorists file, a subset of the Watch List maintained by TSC for dissemination nationwide to federal, state, and local law enforcement through the National Crime Information Center database.   Upon information and belief, the federal government also shares Watch List information with foreign governments and U.S. and foreign airline employees.

24.     Defendants have not stated publicly what standards or criteria are applied to determine whether an individual on the Watch List will be placed on the No-Fly List, which is distributed to TSA.

25.     Defendants have neither confirmed nor denied whether Dr. Baz is in fact on the No-Fly List.   Nor have Defendants provided Dr. Baz any rationale for the basis of his apparent inclusion.

**B.     The No-Fly List is Replete with Errors**

26.     As detailed in *Ibrahim v. Dep't of Homeland Sec.*, 669 F.3d 983, 989 (9th Cir. 2012) and *Latif v. Holder*, 28 F. Supp. 3d 1134, 1139 (D. Or. 2014), various government reports and audits have established that the No-Fly List is rife with errors and inaccuracies and lacks quality controls.

27.     For example, a 2006 U.S. Government Accountability Office report (the "2006 GAO Report") documented how misspelling and misidentification errors, as well as unreliable computer algorithms, resulted in tens of thousands of travelers being misidentified and erroneously included on the No-Fly List.  *See Ibrahim*, 669 F.3d at 983.  The 2006 GAO Report also noted that 30,000 individuals kept on an unrelated TSA list were commonly confused with those on the No-Fly or Selectee Lists.  *Id.*

28.     A 2007 Department of Justice Office of Inspector General report (the "2007 DOJ OIG Report") criticized TSC for its unacceptably "weak quality assurance process," noting that a 2006 TSC internal review of the 71,872 records making up the No-Fly List at the time resulted in the downgrade of 22,412 records from the No-Fly List to the Selectee List, while 5,086 records were deleted from the No-Fly List entirely.  *See Ibrahim*, 669 F.3d at 983.  The 2007 DOJ OIG Report also noted that by January 2007, TSC had cut the No-Fly List by more than half, to 34,230 records, while 45% of records reviewed contained errors.  *Id.*

29.     TSC's approach did not improve by 2009, when the Department of Justice Office of Inspector General completed another audit report (the "2009 DOJ OIG Report"), which concluded that the "FBI did not update or remove watch list records as required."  The 2009 DOJ OIG Report found that the FBI failed to (1) timely remove records in 72 percent of cases where it was necessary, (2) modify watch list records in 67 percent of cases where it was necessary, and (3) remove terrorism case classifications in 35 percent of cases where it was necessary.  *Latif*, 969 F. Supp. 2d 1293 (D. Or. 2013) (Choudhury Decl., Ex. F at iv–vi).

30.     Moreover, a 2009 Department of Homeland Security Office of Inspector General Report titled "Effectiveness of the Department of Homeland Security Traveler Redress Inquiry Program" (the "2009 DHS TRIP Report") noted that a major airline encountered 9,000 erroneous

terrorist watchlist matches per day in April 2008. *Ibrahim*, 669 F.3d at 983. The 2009 DHS TRIP Report also noted that while TRIP offers solutions to some traveler issues, "it does not address other issues effectively, including the most common—watch list misidentification in aviation security settings." *Id.*

31.     This considerable evidence demonstrates that the risk of deprivation based on misidentification or other error is high.

### C.   Original DHS TRIP Redress Procedures

32.     Prior to *Latif v. Holder*, 28 F. Supp. 3d 1134, 1139 (D. Or. 2014), all individuals seeking redress for denial of airline boarding were directed to submit a Traveler Inquiry Form to DHS TRIP online, by email, or by regular mail. The form prompted travelers to describe their complaints, to produce documentation relating to the issue, and to provide identification and their contact information. If the traveler was an exact or near-match to an identity on the Watch List, DHS TRIP forwarded the traveler's complaint to TSC's Redress Unit ("TSC Redress") for further review.

33.     Upon receipt of the complaint, TSC Redress reviewed the available information, including the information and documentation provided by the traveler, and determined whether the traveler was an exact match to an individual on the Watch List. If the traveler was an exact match, TSC Redress also determined whether the traveler should continue to be on the Watch List. When making this determination, TSC coordinated with the agency that originally nominated the individual to be included on the Watch List. If the traveler was misidentified, TSC Redress informed DHS of the misidentification. DHS, in conjunction with any other relevant agency, then addressed the misidentification by correcting information in the traveler's records or taking other appropriate action.

34.     When DHS and/or TSC finished reviewing a traveler complaint, DHS TRIP sent a determination letter advising the traveler that DHS TRIP had completed its review.  A DHS TRIP determination letter neither confirmed nor denied that the complainant was on the Watch List or the No-Fly List.  Further, it provided no explanation as to why the traveler may or may not have been on the Watch List or No-Fly List.  In some cases, a DHS TRIP determination letter advised the recipient that he or she could pursue an administrative appeal of the determination letter with TSA or could seek judicial review in a U.S. court of appeals pursuant to 49 U.S.C. § 46110.

35.     Determination letters did not provide assurances about the complainant's ability to undertake future travel.  Moreover, the complainant did not have an opportunity to contest evidence or offer corrections to the record on which the determination was based.

36.     Upon information and belief, these procedures applied to complainants without regard to citizenship or nationality.  In other words, DHS TRIP did not distinguish between U.S. citizens and LPRs on the one hand, and non-citizens and non-LPRs on the other.

**D.   Current DHS TRIP Redress Procedures**

37.     Following *Latif v. Holder*, 28 F. Supp. 3d 1134, 1139 (D. Or. 2014), the government revised its redress procedures for claims involving denials of boarding for U.S. citizens and LPRs.

38.     Under the revised procedures, in response to an inquiry through the DHS redress program, DHS TRIP must send a notification letter that confirms whether the individual is included on the No-Fly List.

39.     If the individual included on the No-Fly List requests further details, DHS TRIP must provide a more detailed response.  This second letter must specify the criteria under which the individual was placed on the No-Fly List and, to the extent feasible in light of national security interests, provide an unclassified summary of information supporting the individual's No-Fly List

status.   This second letter must also provide the requester an opportunity to be heard further concerning his or her status.  Written responses from such individuals may be submitted and may include exhibits or other materials the individual deems relevant.

40.   Upon DHS TRIP's receipt of an individual's submission in response to the second letter, TSA (in coordination with other relevant agencies) must review the submission and the information being relied on to support the No-Fly listing.

41.   TSA must then issue a final determination and furnish the individual with a final written letter providing the basis for the decision.  TSA must also notify the individual of the ability to seek further judicial review under 49 U.S.C. § 46110.

42.   Upon information and belief, DHS TRIP's revised procedures benefit U.S. citizens and LPRs only.  When a non-citizen, non-LPR seeks relief through DHS TRIP, TSC continues to neither confirm nor deny whether the individual had been included on or remains on the No-Fly List.  Nor will DHS TRIP advise if the non-citizen, non-LPR can fly into the United States or over U.S. airspace in the future.  The government provides no reason for the non-citizen, non-LPR's inclusion on the No-Fly List or any opportunity to confront evidence and contest inclusion.  In short, for non-citizens and non-LPRs, DHS TRIP's procedures remain as they were prior to the revisions implemented following *Latif v. Holder*.

**E.   Dr. Baz's Allegations**

43.   Dr. Baz is a citizen and resident of Pakistan and a prominent physician who holds a Medical Doctorate, a Master's Degree, and a Doctorate of Philosophy in Orthopedic Surgery. Dr. Baz has dedicated his professional career to serving Khyber Pakhtunkhwa Province, a remote part of Pakistan ravaged by war, violence, and economic malaise, by developing and strengthening the healthcare sector.

44.     Dr. Baz is one of the founders and directors of Alliance Healthcare (Private) Limited ("Alliance"), a healthcare network whose projects include a state-of-the-art hospital called the Northwest General Hospital & Research Center ("Northwest General"), a medical college, and a nursing college.

45.     Alliance donated over $12 million (1.35 billion rupees) for the construction of Northwest General, which provides patients from throughout the Khyber Pakhtunkhwa Province access to neurology; neurosurgery; cardiology; cardio-thoracic surgery; ophthalmology; nephrology; urology; pediatrics; pediatric surgery; gastroenterology; hepato-biliary surgery; general medicine; general surgery; dermatology; orthopedic surgery; ear, nose, and throat care; plastic surgery; pulmonology; gynecology; oncology; dentistry; anesthesiology; radiology; pathology; physiotherapy; maxillofacial surgery; and sonology.

46.     Dr. Baz is frequently invited to professional conferences around the world to lecture on issues related to healthcare and orthopedics.  In his personal and professional travels, Dr. Baz has visited at least 80 countries.

### a.  Dr. Baz's Significant Voluntary Connections and Contacts with the United States

47.     Until Defendants effectively banned him from entering the United States or transiting through U.S. airspace, Dr. Baz flew over U.S. airspace and to the United States frequently over the past four decades.  He has developed extensive professional and personal contacts in the United States.

48.     Dr. Baz completed two medical internships in the United States in orthopedic surgery, his area of specialization.  He completed one internship in Louisville, Kentucky, and another internship in Huntington, New York.  He resided in the United States for the duration of the internships.

49.     Dr. Baz has developed numerous close personal and professional relationships during his frequent visits to the United States.  Chief among them is a close relationship with Dr. Robert Kalb, a U.S. citizen who practiced as an orthopedic surgeon in Toledo, Ohio, for over twenty years.  Prior to Defendants' restricting his travel, Dr. Baz regularly visited his friend and colleague in Ohio.

50.     So close is the relationship between Dr. Baz's and Dr. Kalb's families that Dr. Kalb's then-wife arranged to serve as guardian to Dr. Baz's daughter when she had planned to study abroad in the United States.

51.     After the Kalbs' divorce, Dr. Baz maintained a close relationship with both former spouses.  When Dr. Kalb later remarried, Dr. Baz traveled to the United States to help counsel and support his friend and colleague when Dr. Kalb suffered trauma related to a personal family matter.

52.     Dr. Baz's wife and two children have also frequently traveled to the United States. His younger child, a thirteen-year-old son, is a U.S. citizen who was born in Virginia.

53.     Dr. Baz owns and maintains a house in Toledo, Ohio.  In 2012, Dr. Baz purchased the home as his family's residence while in the United States, particularly for his frequent stays in Ohio to see Dr. Kalb.  Dr. Baz also purchased the house to serve as a future residence for his U.S. citizen son, who hopes to attend the University of Toledo or another university nearby.  Dr. Baz plans to stay at this property when visiting his son in the United States.  He has paid and continues to pay taxes on that property to the appropriate taxing authorities in the United States.

54.     Dr. Baz maintains checking and savings accounts at The Huntington National Bank, headquartered in Columbus, Ohio.  He has maintained personal accounts at The Huntington National Bank since the mid-1990s.

55.     Since 1979, Dr. Baz has maintained a relationship with Dr. Arthur Bernhang and his wife Judy Bernhang, residents of Lloyd Harbor, New York.  Dr. Baz frequently visited the Bernhangs and stayed at their home on Long Island.  Dr. Bernhang, a well-known orthopedic surgeon, died in 2016.  Dr. Baz continues to maintain a close friendship with Judy.

56.     Dr. Baz is in regular contact with and has previously visited his niece, Wardah Inam, an LPR of the United States who obtained a Ph.D. from the Massachusetts Institute of Technology ("MIT").  Wardah, who started her own business after graduating from MIT, resides in Boston, Massachusetts, with her husband, also an LPR of the United States.

57.     Prior to his apparent inclusion on the No-Fly List, Dr. Baz traveled regularly to the United States to attend the annual conference of the American Academy of Orthopedic Surgeons ("AAOS").  This conference is the world's largest meeting of orthopedic surgeons, researchers, and related health professionals.  The conference serves as a knowledge exchange across nations, and it offers the latest information on orthopedic treatments, advancements, and research breakthroughs.

58.     Dr. Baz's attendance at the AAOS conferences is instrumental in keeping him abreast of developments in his field of specialization and forms a cornerstone of Dr. Baz's continued medical education regimen.

59.     AAOS conferences also offer Dr. Baz a unique opportunity to build professional relationships crucial for Dr. Baz's healthcare reform efforts in Pakistan.  Through his attendance and participation in the annual AAOS conferences and through earlier visits to the United States, Dr. Baz has developed close working relationships with several American physicians.

60.     Dr. Baz last traveled to the United States to attend the AAOS conference in 2015.

61.     Dr. Baz registered for and planned to attend the 2016 and 2017 AAOS conferences, but he was prevented from doing so both times.  In 2016 and 2017, he was prevented from boarding flights into the United States to attend those conferences, apparently due to his unjustified inclusion on the No-Fly List.

62.     If permitted, Dr. Baz would resume regularly attending AAOS conferences in the United States, would resume his trips to visit friends and family in the United States, and would continue to stay at his home in Toledo, Ohio.  In sum, he hopes to continue to develop his connections with the United States.

**b.  Dr. Baz's Discovery of No-Fly List Designation and Efforts to Seek Relief from the DHS Traveler Redress Inquiry Program**

63.     On February 26, 2016, Dr. Baz flew from Pakistan to Toronto, Ontario.  He was planning to fly from Toronto to Detroit, Michigan, and then from Detroit to Orlando, Florida, in order to attend the 2016 AAOS conference.  At the time, Dr. Baz had a valid U.S. visa and planned on attending the conference from March 1, 2016, to March 5, 2016, before returning to Pakistan.

64.     On February 28, 2016, however, personnel at the Toronto Pearson International Airport told Dr. Baz that he could not board his flight to Detroit, and an airline official advised him that he was not permitted to fly.

65.     After Dr. Baz was denied boarding, an individual appearing to be a U.S. Customs official advised Dr. Baz to speak to an official at the U.S. Consulate in Toronto.

66.     On February 29, 2016, Dr. Baz visited the U.S. Consulate in Toronto and was told to contact the U.S. Consulate in Pakistan.  Unable to attend the AAOC conference and without being able to recoup the costs of his flights, Dr. Baz was forced to fly back to Pakistan from Toronto on March 3, 2016.

67.    On or around February 29, 2016, Dr. Baz completed a Traveler Inquiry Form and submitted it, along with supporting documentation, to DHS TRIP.

68.    On April 29, 2016, Dr. Baz received a letter from DHS TRIP (the "2016 TRIP Letter") in which he was issued an RCN (the "2016 RCN") along with instructions that he should provide that RCN whenever he made travel reservations with flights into the United States.  The 2016 TRIP Letter did not inform Dr. Baz whether he was on the Watch List or the No-Fly List. Nor did it provide the reason why he may have been added to the No-Fly List in or before February 2016.

69.    In or around early January 2017, Dr. Baz received a personal invitation from the AAOS president to attend the 2017 AAOS conference.

70.    At the end of January 2017, Dr. Baz contacted DHS TRIP via email and advised of his plans to attend the March 2017 AAOS conference in San Diego, California, via a connecting flight through Orlando.  In his correspondence with DHS TRIP, Dr. Baz provided his 2016 RCN and inquired whether he was permitted to travel to the United States.

71.    In February 2017, he received a response email from DHS TRIP instructing that he "provide [the 2016] RCN when making reservations" and that "[w]hen entering the United States from abroad, no additional action is required."  This response in no way indicated that Dr. Baz was on the No-Fly List or was otherwise ineligible to fly into the United States.

72.    Relying on DHS's February 2017 guidance, Dr. Baz purchased flights from Pakistan to Dubai, from Dubai to Orlando, and from Orlando to San Diego.  When purchasing these flights, Dr. Baz informed his travel agent that he had been issued an RCN from DHS and provided the agent with his 2016 RCN.  His travel agent booked his flight, reported no problems, and gave no indications that Dr. Baz could not fly into the United States.

73.     Dr. Baz successfully traveled the first leg of his March 2017 trip, flying from Pakistan to Dubai.  When he arrived in Dubai, he went to the airline counter to obtain his boarding pass for the second leg of the flight, from Dubai to Orlando.  The ticketing agent informed Dr. Baz that his boarding ticket for the flight to Orlando had been suspended.  When he advised the agent that he had an RCN issued by DHS, he was told that despite the RCN, he still would not be permitted to fly into the United States.  At this point, Dr. Baz could only conclude that he remained on the No-Fly List, though no U.S. government official had so informed him.

74.     Dr. Baz contacted DHS TRIP on March 8, 2017, via email, providing his 2016 RCN.  In this email, Dr. Baz inquired why DHS TRIP's February 2017 response failed to inform him then that he would not be able to fly into the United States.

75.     Instead of receiving a meaningful response to the questions he raised in his March 2017 email, DHS TRIP sent another boilerplate letter, dated April 3, 2017 (the "2017 TRIP Letter"), which was identical to the April 2016 TRIP Letter, save for a new RCN.

76.     The 2017 TRIP Letter, like the 2016 TRIP Letter and the DHS email guidance, failed to provide Dr. Baz any information about his status.  Instead, the 2017 TRIP Letter stated that his inquiry had been received, that "DHS has researched and reviewed your case," and that "DHS TRIP can neither confirm nor deny any information about you which may be within federal watchlists or reveal any law enforcement sensitive information."

77.     Both the 2016 and 2017 TRIP Letters also stated that DHS had "made any corrections to records that our inquiries determined were necessary, including as appropriate, notations that may assist in avoiding incidents of misidentification."

78.     As had the 2016 version, the 2017 TRIP Letter instructed Dr. Baz that he should provide his travel agent with the new RCN when traveling "by air to or within the United States,"

and further assured him that "[w]hen entering the United States from abroad, no additional action is required." As had the 2016 version, the 2017 TRIP Letter stated that "[t]his letter constitutes our final agency decision."

79.     In short, Defendants stonewalled Dr. Baz by failing to meaningfully respond to multiple queries from him regarding his clearance to travel and by refusing even to state plainly whether Dr. Baz was on the No-Fly List.

### c. Dr. Baz's Suit Seeking Redress for the Improper No-Fly List Designation and Defendants' Retaliatory Visa Revocation

80.     In June 2017, Dr. Baz filed the Review Petition in the United States Court of Appeals for the District of Columbia Circuit. The Review Petition asked the Court to direct DHS to clear Dr. Baz's name from the No-Fly List so he could enter the United States. The petition attached a copy of the 2017 TRIP Letter.

81.     On July 24, 2017, Dr. Baz received email notice from the U.S. Embassy in Islamabad, Pakistan, that his, his wife's, and his daughter's visas had been revoked. He was instructed to submit these passports to the U.S. Embassy so that their visas could be formally stamped as canceled.

82.     Dr. Baz complied, submitting the three passports to the U.S. Embassy in Islamabad; subsequently the three visas were returned to him with revocation stamps.

83.     Upon information and belief, the visa revocations are tied to the erroneous No-Fly List designation and Dr. Baz's attempt at redress, particularly in view of the timing of the revocations and the fact that Dr. Baz had previously been granted multiple-entry visas for the United States over the course of three decades.

84.     Upon information and belief, neither the U.S. Embassy in Islamabad nor any other U.S. government entity will issue Dr. Baz a new visa to the United States until Dr. Baz's name is removed from the Watch and No-Fly Lists.

85.     Dr. Baz's, his wife's, and his daughter's Pakistani passports now bear a prominent "revoked" stamp on the U.S. visa pages.  The stamp has caused Dr. Baz great stigma, resulted in additional unwarranted security screenings, and led to considerable delay in subsequent trips abroad.

86.     In October 2017, Dr. Baz flew to Mexico with a group of physicians.  Because of his revoked U.S. visa, Dr. Baz provoked the suspicion of airport personnel and Dr. Baz's colleagues.  In November 2017, Dr. Baz flew with this group of physicians from Mexico City to San José, Costa Rica, but upon arrival in San José, Dr. Baz was not allowed to enter the country and was forced to return alone to Mexico.  These events embarrassed and stigmatized Dr. Baz.

87.     In August 2017, the government moved to dismiss Dr. Baz's petition, citing *Ege v. DHS*, 784 F.3d 791 (D.C. Cir. 2015), where the Court of Appeals held that it lacked jurisdiction under 49 U.S.C. 46110 to order TSC to remove a name from the No-Fly List.  In light of the government's motion, Dr. Baz withdrew his petition in order to file the instant complaint.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### UNLAWFUL AGENCY ACTION IN VIOLATION OF
### THE ADMINISTRATIVE PROCEDURE ACT (5 U.S.C. § 701, *et seq.*), 49 U.S.C. § 44903, AND 49 U.S.C. § 44926

88.     Dr. Baz repeats and incorporates by reference each allegation contained in the preceding paragraphs as if fully set forth herein.

89.     Dr. Baz has developed and hopes to continue to develop significant voluntary connections with the United States.

90.     The APA prohibits federal agency action that is arbitrary, capricious, unconstitutional, or contrary to statute.  5 U.S.C. § 706(2)(A)–(C).

91.     Defendants have no rational basis to suspect Dr. Baz of being a threat to aviation or U.S. national security.  Dr. Baz has never engaged in terrorist activity or in any way supported or endorsed terrorist activity.  By placing Dr. Baz on the Watch and No-Fly Lists, TSC has acted arbitrarily and capriciously, thereby violating the APA.

92.     Further, Defendant federal agencies have failed to implement coherent and legally sufficient policies for reviewing and correcting mistaken designations on the Watch and No-Fly Lists.

93.     This failure contravenes Congress's directive to Defendant federal agencies to "establish a procedure to enable airline passengers, who are delayed or prohibited from boarding a flight because the advanced passenger prescreening system determined that they might pose a security threat, to appeal such determination and correct information contained in the system" and to provide a "timely and fair process for individuals identified as a threat . . . to appeal to the [TSA] the determination and correct any erroneous information."  *See* 49 U.S.C. § 44903(j)(2)(C)(iii)(I); 49 U.S.C. § 44903(j)(2)(G)(i).

94.     Defendant federal agencies have also failed to fulfill Congress's directive to "establish a timely and fair process for individuals who believe they have been delayed or prohibited from boarding a commercial aircraft because they were wrongly identified as a threat under the regimes utilized by the Transportation Security Administration, United States Customs and Border Protection, or any other office or component of the Department of Homeland Security." *See* 49 U.S.C. § 44926(a).

95.     In implementing Congress's directive to establish a redress procedure, moreover, Defendant federal agencies have granted the full benefits and protections of revised DHS TRIP procedures to U.S. citizens and LPRs only.  Defendant federal agencies have thus ignored the plain meaning of the statutes requiring them to establish a timely and fair redress process for all individuals identified as a threat.  By misinterpreting the statutes and by denying Dr. Baz the full benefits and protections of revised DHS TRIP procedures, Defendant federal agencies have acted arbitrarily, capriciously, and contrary to statute, thereby violating the APA.

96.     Defendants' statutory violations have harmed and continue to harm Dr. Baz by barring him from traveling to the United States, by barring him from traveling through U.S. airspace, and by unjustly stigmatizing him.

## SECOND CAUSE OF ACTION
## FIFTH AMENDMENT – DEPRIVATION OF PROCEDURAL DUE PROCESS RIGHTS

97.     Dr. Baz repeats and incorporates by reference each allegation contained in the preceding paragraphs as if fully set forth herein.

98.     Dr. Baz has developed and hopes to continue to develop significant voluntary connections with the United States.

99.     The Due Process Clause of the Fifth Amendment prohibits the federal government from depriving individuals, including non-citizens who have significant voluntary connections with the United States, of their fundamental rights and liberties without due process of law.

100.    Defendants' placing Dr. Baz on the Watch and No-Fly Lists infringes on Dr. Baz's procedural due process rights.  Dr. Baz has a liberty interest not to arbitrarily be denied the ability to travel with a valid U.S. visa through U.S. airspace and into the United States.  He also has the right to be free from unfounded governmental stigmatization as a suspected terrorist.

101.    As such, the Fifth Amendment vests Dr. Baz with procedural due process rights that include the right to notice as to whether he is on the No-Fly List and also a meaningful opportunity to challenge the bases for his apparent inclusion on the No-Fly List.  Defendants have given Dr. Baz neither notice nor an opportunity to contest his apparent inclusion.

102.    The burden on the government to provide notice of Dr. Baz's inclusion on the No-Fly List and a procedural mechanism to dispute such inclusion would be minimal.  Indeed, revised DHS TRIP redress procedures already require the government to provide U.S. citizens and LPRs notice of their inclusion on the No-Fly List, to present reasons for inclusion, and to offer the traveler an opportunity to submit a written response.  Dr. Baz was denied the benefit of all these procedural safeguards.

103.    Accordingly, Defendants violated Dr. Baz's procedural due process guarantees under the Fifth Amendment, injured his reputation, and caused other damages.

### THIRD CAUSE OF ACTION
### FIFTH AMENDMENT – DEPRIVATION OF SUBSTANTIVE
### DUE PROCESS RIGHTS

104.    Dr. Baz repeats and incorporates by reference each allegation contained in the preceding paragraphs as if fully set forth herein.

105.    Dr. Baz has developed and hopes to continue to develop significant voluntary connections with the United States.

106.    The Due Process Clause of the Fifth Amendment prohibits the federal government from depriving individuals, including non-citizens who have significant voluntary connections with the United States, of their fundamental rights and liberties without due process of law.

107.    Dr. Baz's fundamental rights include the right not to be arbitrarily deprived of his freedom to travel to, from, and within the United States, as well as over U.S. air space.

108.    Dr. Baz also has a fundamental right to be free from unfounded governmental stigmatization as an individual who is known or suspected to be associated with terrorist activity.

109.    Defendants' placing Dr. Baz on the No-Fly List directly and substantially infringes on Dr. Baz's fundamental rights.  Dr. Baz cannot transit through U.S. airspace as a result of the apparent No-Fly List designation.  Dr. Baz also cannot fly to the United States to reside in his home, visit friends, attend medical conferences, or develop professional contacts.  Dr. Baz will not be able to travel to the United States to see his son, an American citizen, after he moves to the United States to attend college, which he intends to do.  Because Defendants also revoked Dr. Baz's visa, he is absolutely barred from entering the United States to enjoy these essential liberties. Moreover, as a prominent physician who is profoundly opposed to violence, Defendant's placement of Dr. Baz on the Watch and No-Fly Lists unjustly stigmatizes him and his reputation. Dr. Baz's Pakistani passport now bears a prominent revocation stamp over his U.S. visa, harming his personal and professional reputation and, when traveling abroad, causing him to be delayed and denied entry.

110.    The Due Process clause forbids Defendants from infringing on Dr. Baz's fundamental rights unless the infringement is narrowly tailored to serve a compelling governmental interest.  Placing Dr. Baz on the Watch and No-Fly Lists serves no governmental interest whatsoever.  Dr. Baz is not a threat to national security interests or aviation.  In fact, for nearly 40 years Dr. Baz has regularly flown to and stayed in the United States without incident.

111.    Accordingly, Defendants violated Dr. Baz's substantive due process guarantees under the Fifth Amendment, injured his reputation, and caused other damages.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests:

1.   A declaratory judgment that Defendants' policies, practices, and customs violate the Fifth Amendment to the U.S. Constitution, the APA, 49 U.S.C. § 44903, and 49 U.S.C. § 44926.

2.   An injunction that requires Defendants to:

    i.   remedy the constitutional and statutory violations identified above, including the removal of Plaintiff from the Watch List, the No-Fly List, and any other database that prevents him flying to, from, and within the United States;

    ii.   confirm Plaintiff is on the Watch and the No-Fly Lists and provide Plaintiff with a legal mechanism that affords him notice of the reasons for his placement on the Watch and No-Fly Lists and a meaningful opportunity to contest his continued inclusion on the Watch and No-Fly Lists; and

    iii.   provide a declaration that Plaintiff is no longer on the Watch and No-Fly Lists and will not be placed back on these lists based on currently available information.

3.   An award of attorneys' fees, costs, and expenses of all litigation, pursuant to 28 U.S.C. § 2412; and

4.   Such other and further relief as the Court may deem just and proper.

## <u>DEMAND FOR TRIAL BY JURY</u>

Plaintiff demands a trial by jury for all issues so triable as a matter of right.


Dated: Washington, D.C.                    Respectfully submitted,
      May 1, 2018


*/s/* Shebaya         

*/s/* Sirine Shebaya       
MUSLIM ADVOCATES
Johnathan Smith (johnathan@muslimadvocates.org)
(D.C. Bar No. 1029373)
Sirine Shebaya (sirine@muslimadvocates.org) (D.C.
Bar No. 1019748)
PO Box 66408
Washington, D.C. 20035
Tel: (202) 897-2622
Fax: (202) 508-1007

HOLWELL SHUSTER & GOLDBERG LLP
Andrei Vrabie (avrabie@hsgllp.com)
*Pro Hac Vice admission forthcoming*
Laura Aronsson (laronsson@hsgllp.com)
*Pro Hac Vice admission forthcoming*
Paul Kemnitzer (pkemnitzer@hsgllp.com)
*Pro Hac Vice admission forthcoming*
David Sanson (dsanson@hsgllp.com)
*Pro Hac Vice admission forthcoming*
750 Seventh Avenue, 26th Floor
New York, NY 10019
Tel.: (646) 837-5151
Fax: (646) 837-5150

ELLAHIE & FAROOQUI LLP
Javed Ellahie (javed@eflawfirm.com)
*Pro Hac Vice admission forthcoming*
12 South First Street, Suite 600
San Jose, CA 95113
Tel: (408) 294-0404
Fax: (408) 886-9468


*Attorneys for Plaintiff*

24